IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SENATOR DOMINIC PILEGGI, ET AL. | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO.  12-0588 |
| CAROL AICHELE, IN HER OFFICIAL | : | |
| CAPACITY AS SECRETARY OF THE | : | |
| COMMONWEALTH OF PENNSYLVANIA | : | |

_____

| | | |
|---|---|---|
| JOE GARCIA, ET AL. | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO.  12-0556 |
| 2011 LEGISLATIVE REAPPORTIONMENT | : | |
| COMMISSION, ET AL. | : | |

_____

| | | |
|---|---|---|
| SAMUEL H. SMITH, IN HIS CAPACITY AS | : | |
| SPEAKER OF THE PENNSYLVANIA | : | |
| HOUSE OF REPRESENTATIVES | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO.  12-0488 |
| CAROL AICHELE, IN HER CAPACITY | : | |
| AS SECRETARY OF THE COMMONWEALTH | : | |
| OF PENNSYLVANIA | : | |

**SURRICK, J.**                                            **FEBRUARY  8 , 2012**

## <u>MEMORANDUM</u>

Presently before the Court are Plaintiffs Senator Dominic Pileggi, Representative Michael

Turzai and Louis B. Kupperman's Motion for Temporary Restraining Order, Preliminary and

Permanent Injunction and for Convening of Three-Judge Panel, Plaintiffs Joe Garcia, Fernando

Quiles and Dalia Rivera Matias's Motion for Temporary Restraining Order and for Convening of a Three-Judge Panel, and Plaintiff Samuel H. Smith's Motion to Convene a Three-Judge Panel.[1] For the following reasons, Plaintiffs' Motions will be denied.

## I.   BACKGROUND

### A.   Pennsylvania Reapportionment Scheme and Election Code

The Pennsylvania Constitution requires reapportionment of the Commonwealth's districts for all seats of the Pennsylvania General Assembly once every ten years.  Pa. Const. art. II, § 17(a).  Any reapportionment plan must comply with the constitutional standard of compact and contiguous districts, equal in population, without unnecessary divisions of counties or

---

[1] There are two related actions:  *Smith v. Aichele*, No. 12-488 (filed Jan. 30, 2012) ("*Smith* Action"), and *Garcia v. 2011 Legislative Reapportionment Commission*, No. 12-556 (filed Feb. 2, 2012) ("*Garcia* Action") (collectively, "Related Actions").  Plaintiffs from *Garcia v. 2011 Legislative Reapportionment Commission* ("*Garcia* Plaintiffs") have filed a Motion for Temporary Restraining Order and for Convening of a Three-Judge Panel.  *See Garcia* Action, ECF No. 2.  In this Memorandum, we incorporate, and address, the arguments asserted in the *Garcia* Plaintiffs' Motion for Temporary Restraining Order and for Convening of a Three-Judge Panel.  Unless otherwise specified, both Motions for Temporary Restraining Order and Convening of a Three-Judge Panel will be referred to, collectively, as "Plaintiffs' Motion."

On February 6, 2012, prior to the hearing on Plaintiffs' Motion, Senator Jay Costa and Representative Frank Dermody ("Intervenors") filed a Motion to Intervene in the instant action, pursuant to Federal Rule of Civil Procedure 24.  (Int'vrs' Mot., ECF No. 11.)  In addition, Intervenors submitted a brief in opposition to Plaintiffs Senator Dominic Pileggi, Representative Michael Turzai and Louis B. Kupperman's Motion for Temporary Restraining Order, Preliminary and Permanent Injunction and for Convening of Three-Judge Panel.  (Int'vrs' Br., ECF No. 11.)  Intevenors also filed a Motion to Dismiss the Complaint in the instant action, pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Int'vrs' Dismiss Mot., ECF No. 12.)  We heard argument by Intervenors' counsel with respect to Plaintiffs' Motion at the February 6, 2012 hearing.  (*See* Feb. 6 Hr'g Tr. 10.)  Intervenors have not filed intervention or dismissal motions in the two Related Actions.

The February 6, 2012 hearing transcript reflects that the plaintiff Smith from *Smith v. Aichele* has joined in Plaintiffs' Motion for Temporary Restraining Order, Preliminary and Permanent Injunction and for Convening of Three-Judge Panel.  (*See* Hr'g Tr. 5, Feb. 6, 2012 (on file with Court) ("Feb 6 Hr'g Tr.").)  Smith has clarified that he has not joined in that Motion.

municipalities.[2]  Article II, Section 17(a) requires that a Legislative Reapportionment Commission ("LRC") be established to develop a reapportionment plan that complies with these requirements.  The LRC is to consist of five members, four of whom shall be the Majority and Minority Leaders of both the Senate and the House of Representatives, or deputies appointed by each of them, and a selected chairman.  Pa. Const. art. II, § 17(b).

The LRC has ninety days from the date on which it becomes duly certified or from the date on which the population data for the Commonwealth as determined by the federal decennial census become available, whichever is later in time, to file a preliminary reapportionment plan. Pa. Const. art. II, § 17(c).  The public has a thirty-day period to file exceptions to that preliminary plan.  *Id.*  If no exceptions are filed within thirty days, or if exceptions are filed and acted upon, the LRC's plan becomes final.  *Id.*  Once a plan is final, any aggrieved person may file an appeal from the final plan directly to the Pennsylvania Supreme Court within thirty days.  Pa. Const. art. II, § 17(d).  If an appellant establishes that a final plan is contrary to law, the Supreme Court is directed to issue an order remanding the plan to the LRC and directing the LRC to reapportion the Commonwealth in a manner not inconsistent with such order.  *Id.*  A reapportionment plan has the force of law only when the Supreme Court has "finally decided" an appeal, or when the time for filing an appeal has passed with no appeal being taken.  Pa. Const. art. II, § 17(e).  Once

---

[2] Article II, Section 16 of the Pennsylvania Constitution states as follows:

The Commonwealth shall be divided into fifty senatorial and two hundred three representative districts, which shall be composed of compact and contiguous territory as nearly equal in population as practicable. Each senatorial district shall elect one Senator, and each representative district one Representative. Unless absolutely necessary no county, city, incorporated town, borough, township or ward shall be divided in forming either a senatorial or representative district.

a reapportionment plan has the force of law, the districts provided in the plan are to be used in subsequent elections for the General Assembly until the next reapportionment is required.  *Id.*

The Pennsylvania Election Code sets forth certain deadlines.  For example, in a Presidential election year, such as the present year 2012, the primary is to be held on the fourth Tuesday of April.  25 P.S. § 2753(a).  Candidates for all offices to be filled at the ensuing general election are to be nominated by this primary, and the vote for candidates for the office of President of the United States is to be cast at the primary.  *Id.*  In a Presidential election year, "every registered and enrolled member of a political party shall have the opportunity at the Spring primary in such years to vote his preference for one person to be the candidate of his political party for President."  25 P.S. § 2862.  On or before the thirteenth Tuesday preceding the primary, the Secretary of the Commonwealth is to (1) provide to the board of each county a list of the political parties which are to nominate candidates at primaries and (2) send to the county board a written notice designating all of the offices for which candidates are to be nominated.  25 P.S. §§ 2861, 2865.  Not earlier than twelve weeks, nor later than eleven weeks, before the primary, the county board is to publish in local newspapers a notice setting forth (1) the number of delegates and alternate delegates to the national convention of each party who are to be elected in the Commonwealth at large at the ensuing primary, (2) the number of delegates and alternate delegates who are to be elected at the primary, (3) the names of all public offices for which nominations are to be made, and (4) the names of all party offices, including that of members of the National Committee, if any, and Commonwealth Committee, for which candidates are to be elected at the primary ("Proclamations").  25 P.S. § 2866.  No later than fifty days before the day of the primary or seventy days before the day of the election, the county board is to commence

sending military and overseas ballots to remote or isolated locations.  25 P.S. § 3146.5(a).  No later than forty-five days before the day of the primary, the county board is to commence delivering official absentee ballots or special write-in absentee ballots when official absentee ballots have not yet been printed.  *Id.*  Applications for absentee ballots generally are to be received in the office of the county board not earlier than fifty days before the primary and not later than 5:00 p.m. of the first Tuesday prior to the day of the primary.  25 P.S. § 3146.2a.  The Code provides for a number of other deadlines in addition to these.

    **B.**    **Background Facts**

        *1.*    *The Parties in the Instant Action*

Plaintiffs Dominic Pileggi, Michael Turzai and Louis B. Kupperman are citizens of, and registered voters in, the Commonwealth of Pennsylvania.  (Compl. ¶¶ 4-6, ECF No. 1.)[3]  Pileggi is a Pennsylvania state Senator, the Majority Leader of the Pennsylvania Senate and a member of Pennsylvania's 2011 LRC; Turzai is a Pennsylvania state Representative, the Majority Leader of the Pennsylvania House of Representatives and a member of Pennsylvania's 2011 LRC.  (*Id.* at ¶¶ 4-5.)

Defendant Carol Aichele is the Secretary of the Commonwealth of Pennsylvania and Chief Election Official.  (*Id.* at ¶¶ 7-8.)  Secretary Aichele's duties, in her official capacity, include providing the county boards of elections with written notice of all offices for which candidates are to be nominated; determining the sufficiency of nominating petitions, certificates and papers of candidates; certifying to county boards of elections the names of candidates for primaries and elections; proclaiming election results; and issuing certificates of election to

---

    [3] The facts alleged in Plaintiffs' Complaint have been verified as true and correct.

successful candidates.  (*Id.* at ¶ 8.)

### 2.   The 2001 Reapportionment Plan

On November 19, 2001, the existing LRC filed a final reapportionment plan.  (*Id.* at ¶ 10.)  This plan was approved by the Pennsylvania Supreme Court on February 15, 2002 ("2001 Plan").  (*Id.*)  The 2001 Plan was based on census data from 2000 and has been in effect since approved.  (*Id.* at ¶ 11.)

### 3.   The 2011 Reapportionment Plan

In 2010, the federal decennial census was conducted.  Plaintiffs allege that the data from this census reveal that, from 2000 to 2010, a population shift from western Pennsylvania to eastern Pennsylvania was a continuing trend from the 2000 census.  (*Id.* at ¶ 12.)

Pursuant to Article 2, Section 17(a) of the Pennsylvania Constitution, in 2011, the LRC was assembled for the purpose of reapportioning the Commonwealth of Pennsylvania, based on the 2010 census data.  *Holt v. 2011 Legislative Reapportionment Comm'n*, No. 7 MM 2012 (Pa. Feb. 3, 2012) ("Pa. Sup. Ct. Op.") 10.  On August 17, 2011, the LRC declared the 2010 census data to be in usable form, thereby triggering the ninety-day period for filing a preliminary reapportionment plan.  *Id.* at 11.  The LRC announced a preliminary reapportionment plan on October 31, 2011.  *Id.* at 12.  On December 12, 2011, the LRC adopted its final reapportionment plan for Pennsylvania ("2011 Plan").  *Id.*[4]

Following the adoption of the 2011 Plan, twelve separate appeals were filed by

---

[4] The *Garcia* Plaintiffs allege that, in 2011, a non-partisan coalition of concerned Latino voters, called LatinoLines, participated directly in this redistricting process.  Compl., *Garcia* Action ("*Garcia* Compl.") ¶ 31, ECF No. 1.  The group submitted proposed plans for Philadelphia, Lehigh and Berks counties to the 2011 LRC.  *Id.* at ¶ 32.

Pennsylvania citizens claiming to be aggrieved.  Pa. Sup. Ct. Op. 12.  The Pennsylvania Supreme

Court held oral argument on these challenges on January 23, 2011.  *Id.* at 13.  On January 25,

2012, the Pennsylvania Supreme Court, in a 4-3 decision, issued a *per curiam* order, in which it

held that the final 2011 Plan was "contrary to law."  Order, Pa. Sup. Ct. Op. ("Pa. Sup. Ct.

Order") 5.  The Supreme Court remanded the 2011 Plan to the LRC and directed it to reapportion

the Commonwealth in a manner consistent with its Opinion, which would follow.  *Id.*  The Court

ordered that the 2001 Plan "shall remain in effect until a revised final 2011 Legislative

Reapportionment Plan having the force of law is approved."  *Id.* at 5-6.  The Pennsylvania

Supreme Court has retained jurisdiction until it approves a final constitutional reapportionment

plan.  *Id.*  In addition, the Court adjusted several of the 2012 election dates.  *Id.* at 6.  On

February 3, 2012, the Pennsylvania Supreme Court issued an eighty-seven-page majority

opinion.  Pa. Sup. Ct. Op.  Justices Saylor and Eakin each filed concurring and dissenting

opinions, and Justice Orie Melvin filed a dissenting opinion.

 The process has begun for moving the 2012 election forward.  The Pennsylvania primary

election is still scheduled to be held on April 24, 2012.  (Feb. 6 Hr'g Tr. 14.)  The first day to

circulate nomination petitions was January 26, 2012.  Pa. Sup. Ct. Order 6.  Pursuant to the

Pennsylvania Election Code, January 31, 2012 was the first day for counties to publish

Proclamations in the newspaper.  25 P.S. § 2866.  February 7, 2012 is the last day on which

counties may publish Proclamations in the local newspapers.  *Id.*  February 14, 2012 is the last

day to circulate and file nomination petitions for the offices of President of the United States,

United States Senator, United States Representative, Attorney General, Auditor General, State

Treasurer and Delegate and Alternate to the National Convention.  *See* 25 P.S. §§ 2868, 2873(d).

February 15, 2012 is the first day for circulating and filing nomination papers for independent candidates of political bodies or candidates of minor political parties for all offices.  25 P.S. § 2913.  The Republican National Convention is scheduled to begin on August 27, 2012.  *See* 2012 Republican National Convention, http://gopconvention2012.com/.  The Democratic National Convention is scheduled to begin on September 3, 2012.  *See* 2012 Democratic National Convention, http://www.demconvention.com/.

### C.   Procedural History

#### 1.   *Filing of The Instant Action and Two Related Actions*

On January 30, 2012, Samuel H. Smith, in his capacity as Speaker of the Pennsylvania House of Representatives, filed a lawsuit against Defendant.[5]  Smith, who is not a member of the LRC, seeks a declaratory judgment that use of the 2001 Plan in future elections violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and the Equal Protection provisions of the Pennsylvania Constitution.  *Smith* Compl. ¶¶ 51-62.  On February 3, 2012, Smith filed a Motion to Convene a Three-Judge Panel.  *Smith* Action, ECF No. 6.

On February 2, 2012, Joe Garcia, Fernando Quiles and Dalia Rivera Matias, three registered Latino voters in the Commonwealth of Pennsylvania, filed a lawsuit against the 2011

---

[5] The Speaker, as presiding officer of the House, is directed to issue a writ of election to fill any vacancy which occurs in the House for the remainder of the legislative term.  Generally, the Speaker is required to issue a writ of election within ten days after a vacancy occurs in the House.  25 P.S. § 2778.  However, this rule does not apply during periods associated with the legislative reapportionment of the Commonwealth.  If a vacancy occurs from the time a preliminary reapportionment plan is filed by the LRC until a final reapportionment plan "attains the force of law," the presiding officer of the House shall have the authority, notwithstanding any other provisions of law to the contrary, to delay the issuance of a writ of election until ten days after the date the final plan attains the force of law."  25 P.S. § 2778a.

LRC, and Defendant, in her capacity as Secretary of the Commonwealth of Pennsylvania and as Chief Election Officer of the Commonwealth of Pennsylvania.  The *Garcia* Plaintiffs allege violations of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and Section 2 of the Voting Rights Act of 1965 ("VRA"), as amended, 42 U.S.C. § 1973.  *Garcia* Compl. ¶¶ 50-53.  They seek a court order that a new legislative redistricting plan be timely enacted for the 2012 elections in April and November.  *Id.* at ¶ 2.  On February 6, 2012, the *Garcia* Plaintiffs filed a Motion for Temporary Restraining Order and for Convening of Three-Judge Panel.  *Garcia* Mot., *Garcia* Action, ECF No. 2.

On February 3, 2012, Plaintiffs filed the instant action, asserting violations of federal and state constitutional rights and seeking to prevent Defendant, "acting in her official capacity, from administering the primary election in violation of the 'one person, one vote' Constitutional mandate" through the "Court's immediate intervention and injunctive relief."  (Compl. ¶¶ 3, 39-49.)

### 2.    *Plaintiffs' Contentions*

The underlying contentions in the *Smith*, *Garcia* and instant actions are essentially the same.  All Plaintiffs contend that the 2010 census data expose "the current infirmities of the 2001 Plan, as the state legislative districts delineated in that plan can no longer be said to meet the equal population requirement established by the United States Constitution as well as the Pennsylvania Constitution."  (*Id.* at ¶¶ 12, 20-21.)

Smith asserts that, "[a]ccording to 2010 census statistics, the 'target population' — which is the population that would allow equal apportionment of Pennsylvania residents among its 203 [House] districts — is 62,573 residents per district."  *Smith* Compl. ¶ 44.  These districts

currently vary widely in population.  For example, House District 134 has a population of 77,873 residents under the 2001 Plan, which exceeds the 2010 target population by 15,300, or 24.45 percent.  *Id.* at ¶¶ 45-46.  District 159 has a population of 51,068 under the 2001 Plan, which falls short of the 2010 target population by 11,505, or 18.39 percent.  *Id.* at ¶ 47.

The *Garcia* Plaintiffs allege that, according to the 2010 census, Pennsylvania's population is 12,702,379, and Latinos comprise 719,660, or 5.7 percent, of the Commonwealth's total population.  *Garcia* Compl. ¶ 24.  There are 187,611 Latino residents in Philadelphia, and Latinos comprise over twelve percent of the city's population.  *Id.* at ¶ 25.  The growth rates of Latinos have outpaced the overall growth rates of both Philadelphia and the Commonwealth of Pennsylvania.  *Id.* at ¶ 26.  Specifically, the population of Latino residents in Philadelphia has grown by more than forty-five percent.  *Id.*  In Allentown, there are 118,032 total residents, of which there are 50,517 Latino residents.  Latinos comprise 42.8 percent of the Allentown population.  *Id.*  There are 51,263 Latino residents out of the total population of 88,082 residents in Reading.  Latinos comprise 58.2 percent of the population in Reading.  *Id.*  There is currently only one majority Latino House district, and there are no majority Latino Senate districts.  *Id.* at ¶ 28.  The *Garcia* Plaintiffs claim that Latino political representation has not kept pace with the rapid Latino population growth that the Commonwealth has experienced over the past decade. *Id.* at ¶ 29.  Thus, both Smith and the *Garcia* Plaintiffs claim malapportionment.  For example, Senate District 44 is overpopulated by 34,626 persons, for a deviation from the target population, based upon 2010 census figures, of 13.63 percent.  *Id.* at ¶ 36.  Senate District 38, by contrast, is underpopulated by 40,058 persons, for a deviation of 15.77 percent.  *Id.*  House District 13 is overpopulated by 15,204 persons, for a deviation of 24.3 percent, and House District 24 is

underpopulated by 11,569 persons, for a deviation of 18.498 percent.  *Id.* at ¶ 37.

Like the other plaintiffs, Plaintiffs in the instant action assert that the population of many of the current Senate districts in southwestern Pennsylvania, as delineated under the 2001 Plan, fall short of the target Senate district population by more than ten percent, based upon the 2010 census data.  (*Id.* at ¶ 24; *see also Smith* Compl. ¶ 48.)  For example, Senate District 38 falls short from the target population by 39,773 persons, or 15.7 percent; Senate District 45 by 33,067 persons, or thirteen percent; Senate District 32 by 28,411 persons, or 11.2 percent; Senate District 47 by 28,259 persons, or 11.1 percent.  (*Id.* at ¶ 24.)  By contrast, many Senate districts in the growing eastern and southeastern regions of the Commonwealth have populations, under the 2001 Plan, which exceed the target population, based upon the 2010 census data, by ten percent or more.  (*Id.*)  For example, Senate District 44 exceeds the target population by 34,625 persons, or 13.6 percent; Senate District 16 by 34,225 persons, or 13.5 percent; Senate District 28 by 30,414 persons, or twelve percent; Senate District 19 by 26,926 persons, or 10.6 percent.  (*Id.*)  Plaintiffs allege that the current House districts, as delineated under the 2001 Plan, are similarly out of line with the target population, based on 2010 census figures.  (*Id.* at ¶¶ 25-29.)  Plaintiffs cite as specific examples Pennsylvania House District 159, which exceeds the target population by 10.9 percent; House District 28, which exceeds the target population by 7.5 percent; and House District 157, which exceeds the target population by 7.1 percent.  (*Id.* at ¶ 32.)  Plaintiffs also cite as specific examples Pennsylvania Senate District 9, which exceeds the target population by 9.2 percent; Senate District 40, which exceeds the target population by 0.8 percent; and Senate District 19, which exceeds the target population by 10.6 percent.  (*Id.* at ¶ 31.)  Plaintiffs assert that, in light of these deviations, many Pennsylvania residents will be "severely

and unconstitutionally under-represented" in the Senate and House.  (*Id.* at ¶¶ 33-34.)  They

argue that, if the 2012 elections are administered under the 2001 Plan, the Equal Protection

Clause of the Fourteenth Amendment of the United States Constitution, and Article I, Sections 1,

5 and 26 and Article II, Section 16 of the Pennsylvania Constitution, will be violated.  (*Id.* at ¶¶

36-37.)

         3.     *Plaintiffs' Motion and Intervention*

On the afternoon of February 3, 2012, Plaintiffs filed the instant Motion requesting a

temporary restraining order "by a preliminary and permanent injunction enjoining Defendant

from calling, holding, supervising or certifying any forthcoming elections in the Commonwealth

of Pennsylvania using Pennsylvania's 2001 Legislative Reapportionment Plan."  (Pls.' Mot. ¶ 3,

ECF No. 2.)  Also on that afternoon, the Pennsylvania Supreme Court issued its opinion

declaring the 2011 Plan unconstitutional and remanding the Plan to the 2011 LRC.  Pa. Sup. Ct.

Op. 80.

On the morning of February 6, 2012, Senator Jay Costa, Minority Leader of the Senate,

and Representative Frank Dermody, Minority Leader of the House, both members of the LRC,

submitted a motion to intervene, pursuant to Federal Rule of Civil Procedure 24.  (Int'vrs' Mot.)

In addition, Intervenors submitted a brief in opposition to Plaintiffs' motion for a temporary

restraining order and preliminary and permanent injunction (Int'vrs' Br.), as well as a motion to

dismiss Plaintiffs' Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6) (Int'vrs'

Dismiss Mot.).

A hearing on Plaintiffs' Motion was held on February 6, 2012.  At the hearing, counsel

for Smith, Aichele, the *Garcia* Plaintiffs, Plaintiffs in this instant action and Intervenors

appeared.  Counsel presented arguments in support of, or in opposition to, Plaintiffs' Motion for

Temporary Restraining Order.  Counsel for the 2011 LRC did not appear at the February 6, 2012

hearing.

On February 7, 2012, Plaintiffs in the instant action filed a Reply in further support of

their Motion for Temporary Restraining Order.  (Pls.' Reply, ECF No. 16.)

To date, the LRC has not approved a revised reapportionment plan based upon the 2010

census data, and the Pennsylvania Supreme Court has not approved a reapportionment plan based

upon 2010 census data.

## II.   LEGAL STANDARD

Preliminary injunctive relief is an "extraordinary remedy" and "should be granted only in

limited circumstances."  *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004).  "A

temporary restraining order is a 'stay put,' equitable remedy that has its essential purpose the

preservation of the status quo while the merits of the cause are explored through litigation."  *J.O.*

*v. Orange Twp. Bd. of Educ.*, 287 F.3d 267, 273 (3d Cir. 2002) (citations omitted).  The standard

for granting a temporary restraining order under Federal Rule of Civil Procedure 65 is the same

as that for issuing a preliminary injunction.  *Bieros v. Nicola*, 857 F. Supp. 445, 446 (E.D. Pa.

1994).  A plaintiff must demonstrate:  (1) a likelihood of success on the merits; (2) the

probability of irreparable harm if the relief is not granted; (3) that granting injunctive relief will

not result in even greater harm to the other party; and (4) that granting relief will be in the public

interest.  *Id.* (citing *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102 (3d

Cir. 1988)); *see also Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 158 (3d Cir. 1999)

(setting forth the four elements for demonstrating need for preliminary injunction).

III.    **DISCUSSION**

Plaintiffs in the instant action assert violations of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, and Article I, Sections 1, 5 and 26 and Article II, Section 16 of the Pennsylvania Constitution.  The plaintiffs in the Related Actions allege similar violations.  *See Smith* Compl. ¶¶ 51-62 (asserting violation of Equal Protection Clause of Fourteenth Amendment of United States Constitution and Article I, Sections 1 and 26 (equal protection) and Article I, Section 5 of the Pennsylvania Constitution (free and equal election)); *Garcia* Compl. ¶¶ 50-53 (asserting violation of Equal Protection Clause of Fourteenth Amendment of federal Constitution and violation of Section 2 of the VRA, as amended, 42 U.S.C. § 1973).  All Plaintiffs request that the Court intervene in Pennsylvania's redistricting scheme and declare that the 2001 Plan may not be used for the 2012 primary election, which is expected to take place on April 24, 2012.  In light of the February 3, 2012 Pennsylvania Supreme Court opinion, which directs the 2012 election to move forward based on the 2001 Plan, we have been asked to enjoin Defendant from moving forward with the April 24, 2012 primary election process.  (Feb. 6 Hr'g Tr. 6.)

A.    **The Public Interest in an Orderly Election Process and in Voters' Participation in the 2012 Election—Particularly, the Primary Election in the Spring of This Presidential Year—Requires Denial of Plaintiffs' Requested Relief**

1.    *In Light of the Imminent Primary Election, and the Fact that the Election Process Has Begun, Use of the 2001 Plan is Permissible Under* Reynolds v. Sims *and Its Progeny*

Federal courts must act cautiously when asked to interfere with state election matters. "[T]he 'Constitution leaves with the States [the] primary responsibility for apportionment of their

-14-

federal congressional and state legislative districts.'"  *Growe v. Emison*, 507 U.S. 25, 34 (1993) (citing U.S. Cons., Art. I, § 2).  Reapportionment is primarily for the legislature to consider and determine; "judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so."  *Reynolds v. Sims*, 377 U.S. 533, 586 (1964).  "[R]eapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court."  *Chapman v. Meier*, 420 U.S. 1, 27 (1975); *see also Scott v. Germano*, 381 U.S. 407, 409 (1965) (noting preference for both state legislature and state court to federal courts as agents of apportionment).

"Equity demands that a federal court stay its hand when judicial relief does not make sense."  *Mac Govern v. Connolly*, 637 F. Supp. 111, 116 (D. Mass. 1986).  In *Reynolds v. Sims*, the Supreme Court discussed the role of federal courts in state legislative apportionment cases.  Specifically, the Court observed that there are "certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress," in which a court may withhold the granting of relief, even if the existing apportionment scheme is found to be invalid.  377 U.S. at 585.  The Court advised:

> In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles. With respect to the timing of relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree.

*Id.*; *see also Upham v. Seamon*, 456 U.S. 37, 44 (1982) ("It is true that we have authorized District Courts to order or to permit elections to be held pursuant to apportionment plans that do

-15-

not in all respects measure up to the legal requirements, even constitutional requirements. Necessity has been the motivating factor in these situations.") (internal citation omitted).  Since the *Reynolds* decision, a number of federal courts have withheld the granting of relief, and even dismissed actions, where an election was imminent and the election process had already begun. *See, e.g.*, *Political Action Conference of Ill. v. Daley*, 976 F.2d 335, 338-41 (7th Cir. 1992) (affirming district court's dismissal of plaintiffs' complaints alleging Equal Protection and Section 2 VRA claims for failure to state a claim); *Clark v. Marx*, No. 11-2149, 2012 WL 41926, at *7 (W.D. La. Jan. 9, 2012) (denying preliminary injunction, despite the fact that the short holdover period may have been sufficient to constitute a violation of the Equal Protection Clause, because "this [wa]s the type of case in which the Supreme Court [in *Reynolds*] has guided federal courts to use restraint and decline to grant the immediate relief requested"); *Graves v. City of Montgomery*, No. 11-557, 2011 WL 3503133, at *13-15 (M.D. Ala. Aug. 10, 2011) (dismissing Equal Protection claim and Section 2 VRA claim where "[t]he impending election falls squarely within the *Reynolds* time frame of imminency"); *Old Person v. Brown*, 182 F. Supp. 2d 1002, 1017, 1020 (D. Mont. 2002) (observing *Reynolds*' observation of circumstance where impending election is imminent and entering judgment in favor of defendants with respect to plaintiffs' Section 2 VRA claim); *Cardona v. Oakland Unified Sch. Dist.*, 785 F. Supp. 837, 843 (N.D. Cal. 1992) (denying motion for preliminary injunction and dismissing action where "[t]he Oakland election machinery [wa]s already in gear for the June 2, 1992 primary election").

The facts of this case fall squarely within the *Reynolds* framework.  Pennsylvania's primary election is scheduled to be held on April 24, 2012, which is eleven weeks away.  The election process has already begun.  The first day to circulate nomination petitions was January

26, 2012.  January 31, 2012 was the first day for counties to publish Proclamations in the local newspapers.  Defendant has already spent in excess of three quarters of a million dollars on the 2012 election process.  (Feb. 6 Hr'g Tr. 8.)  There are election deadlines that are fast-approaching.  February 7, 2012 is the last day for counties to publish Proclamations in the local newspapers.  February 14, 2012 is the last day to circulate and file nomination petitions for the offices of President of the United States, United States Senator, United States Representative, Attorney General, Auditor General, State Treasurer and Delegate and Alternate to the National Conventions.  *See* 25 P.S. §§ 2868, 2873(d).  The following day, February 15th, is the first day to circulate and file nomination papers for independent candidates of political bodies or candidates of minor political parties for all offices.  *See* 25 P.S. § 2913(b).

In *Maryland Citizens for a Representative General Assembly v. Governor of Maryland*, 429 F.2d 606 (4th Cir. 1970), the plaintiffs sought a declaration that the statute apportioning Maryland's General Assembly was unconstitutional and an injunction restraining election officials from conducting the 1970 primary and general elections.  *Id.* at 607.  The district court denied the requested relief and dismissed the action.  The Court of Appeals for the Fourth Circuit affirmed the district court's decision.  *Id.*  Reviewing the *Reynolds* decision, the Appeals Court noted the need to consider the consequences of convening a three-judge panel, and of adjudicating, after presentation of evidence and argument, the constitutionality of an apportionment plan.  *Id.* at 608-12.  It considered the possibility that the court would have to fashion its own reapportionment plan.  *Id.*  It then considered the likelihood that the release of a new reapportionment plan "close upon the eve of the [] deadline for the filing of candidacies" "would necessarily impose great disruption upon potential candidates, the electorate and the

elective process." *Id.* at 610.  The Court determined that this was not a situation where the state adamantly refused to comply with clear constitutional mandates and court orders.  *Id.*  To avoid great disruption to the election process, the Court determined that the injunction requested by the plaintiffs was not available.  *Id.* at 610-11.

The analysis in *Maryland Citizens* applies here.  There is no indication that the Commonwealth has adamantly refused to comply with constitutional mandates and court orders.  To the contrary, the LRC has complied with the law, albeit slowly, and has indicated an intention to unveil a revised 2011 Plan, in compliance with the Pennsylvania Supreme Court's Order, by February 22, 2012.  In *Maryland Citizens*, the complaint seeking an injunction was filed only thirteen weeks prior to the deadline for candidates to file certificates of candidacy.  The primary election was to be held approximately five months after the date of the filing of the complaint.  *See id.* at 609 (noting that complaint was filed on April 6, 1970, that certificate filing deadline was thirteen weeks away from that date, that primary election was to be held on September 15, 1970, and that general election was to be held on November 3, 1970).  Here, the primary election is eleven weeks away.  In view of this immediacy, we are compelled to have the elections proceed under the 2001 Plan.  In short, this is precisely a case "where an impending election is imminent and a State's election machinery is already in progress," such that a court may withhold from granting relief, even if the existing apportionment scheme is found to be invalid.  *Reynolds*, 377 U.S. at 585.

In response to this Court's inquiry as to the necessity of a temporary restraining order at this juncture, Plaintiffs in the instant action assert that there are "two unassailable facts that confirm Plaintiffs' right to the temporary restraining order that they seek":  (1) use of the 2001

Plan violates the federal Constitution; and (2) the 2001 Plan's unconstitutionality will not change with the passage of time.  (Pls.' Reply 2; Feb. 6 Hr'g Tr. 4.)  Plaintiffs point to various population deviations in certain districts as evidence of the unconstitutionality of the 2001 Plan. Their argument, however, completely ignores the *Reynolds* principle that, "where an impending election is imminent and a State's election machinery is already in progress," a court may withhold granting relief, *even if the existing apportionment scheme is found to be invalid*. *Reynolds*, 377 U.S. at 585; *see also Graves*, 2011 WL 3503133, at *3, 15 (dismissing Equal Protection claim and Section 2 VRA claim even where three of the existing nine city council districts were overpopulated by 15.7 percent, 38.7 percent and 21.7 percent, respectively, and other districts were underpopulated); *Cardona*, 785 F. Supp. at 843 & n.11 (denying motion for preliminary injunction and dismissing action even where the maximum deviation was 17.8 percent).

> 2.    *Granting a Temporary Restraining Order Will Not Provide Clarity to the 2012 Elections Process and Will Effectively Disenfranchise Voters and Undermine the Public Interest*

During the February 6, 2012 hearing on Plaintiffs' Motion, Defendant requested "clarity, speed, and certainty" from the Court with respect to instructions on how to proceed with the 2012 primary election.  (Feb. 6 Hr'g Tr. 9.)  Unfortunately, at this late date, granting a temporary restraining order will not provide clarity, speed or certainty.  In fact, it will accomplish just the opposite.  Granting a temporary restraining order at this stage will delay the primary election and potentially disenfranchise Pennsylvania voters.

The Pennsylvania Supreme Court ruled in its eighty-seven-page majority opinion that the 2011 Plan is unconstitutional and directed the LRC to reapportion the Commonwealth in a

manner consistent with that Court's Opinion.  As a precaution, the Court directed that the 2001 Plan remain in effect until a revised final 2011 Plan has been approved and has the force of law. While the LRC has stated its intention to deliver a preliminary 2011 Plan later this month, it is, of course, entirely possible that the Plan will not be ready by that date.  And even if the preliminary Plan is completed later this month, in light of the exceptions, corrections and appeals processes, the date of final approval of the revised 2011 Plan will run up against the April 24th primary election date.[6]  In the meantime, what is the Secretary of the Commonwealth to do.

To enjoin the 2012 election from proceeding under the 2001 Plan would leave the Pennsylvania primary in a state of unacceptable uncertainty.  Perhaps this is why the Supreme Court directed that the 2001 Plan be used.  In *Mac Govern v. Connolly*, the District Court denied injunctive relief and dismissed the complaint based upon failure to state a claim because equity demanded that the "federal court stay its hand whe[re] judicial relief ma[de] no sense."  637 F. Supp. at 116.  The district court justified its determination by noting that an injunction would not "obviate the Commonwealth's obligation, under its own constitution, to reapportion based on [the most recent] census.  Court intervention at this point, then, would not only cause the dislocation that accompanies any reapportionment, it might well cause it twice."  *Id.*  The principle in *Mac Govern v. Connolly* that federal courts should stay their hand where judicial intervention does nothing to clarify, at best, and could cause further confusion and disorder, at worst, applies here.  *See also Donatelli v. Mitchell*, 2 F.3d 508, 518 (3d Cir. 1993) (affirming

---

[6] If the LRC took just two days to release its revised plan on or until February 24, 2012, individuals have 30 days to correct that plan or until March 25, 2012.  Assuming that the plan becomes final on that day, the appeals process ends on April 24, 2012, primary election day. This does not even allow for Supreme Court action on any appeals.

grant of summary judgment in favor of Secretary of the Commonwealth of Pennsylvania because it was not the court's place to determine whether the commission's decisions with respect to the challenged senatorial reapportionment plan were good decisions).  With election deadlines quickly approaching, and no existing alternative reapportionment plan, Defendant needs certainty as to how to proceed.  There is no reasonable alternative at this point but to allow the elections to proceed under the 2001 Plan.

To complicate matters further, 2012 is a Presidential election year.  In Pennsylvania, during the year of a Presidential nomination, the primary is to be held on the fourth Tuesday of April.  25 P.S. § 2753.  The Pennsylvania Code states that, "[i]n the years when candidates for the office of President of the United States are to be nominated, every registered and enrolled member of a political party shall have the opportunity at the [s]pring primary in such years to vote his preference for one person to be the candidate of his political party for President."  25 P.S. § 2862.

If a revised plan is completed by February 22nd, in light of the exceptions, corrections and the appeals processes, the date for final determination as to the legality of that Plan will run up against the April 24th primary election date.[7]  Clearly, the primary would have to be postponed so that the Secretary of the Commonwealth and other election officials could fulfill their statutory obligations.  Since the Republican National Convention is scheduled to begin on August 27, 2012 and the Democratic National Convention is scheduled to begin on September 3,

---

[7] Indeed, the Pennsylvania Supreme Court directly addressed this time lag in its majority opinion:  "We note that once the LRC approves a new preliminary plan, the Constitution affords persons aggrieved by the new plan a right to object, before the plan is finally approved by the LRC, and to a subsequent right to appeal to this Court.  Should such appeals be filed, we will decide them with alacrity, as we have decided the ones now before us."  Pa. Sup. Ct. Op. 87 n.40.

2012, it is imperative that the primary election occur on or as close to April 24, 2012 as possible.

In sum, the Pennsylvania Supreme Court has directed that, in lieu of a constitutional revised reapportionment plan, the 2012 election should proceed using the 2001 Plan.  At this time, there has been no action taken to change the date of the primary.  We can only speculate as to whether or when there will be a constitutionally approved reapportionment plan based upon the 2010 census.  Because there is presently no alternative plan, if we issue a temporary restraining order and request a three-judge panel, the primary election certainly will not occur as required by statute.  Depending on what happens with the LRC, Pennsylvania voters could be disenfranchised.  *See Diaz v. Silver*, 932 F. Supp. 462, 468-69 (E.D.N.Y. 1996) (listing cases holding that, because there does not appear to be any alternative redistricting plan readily available, the harm to the public in delaying either the primary or the general election, or even changing the rules as they now stand, substantially outweighs the likely benefit to the plaintiffs of granting a preliminary injunction).  A delayed election this year could deprive Pennsylvania voters of their right to choose delegates to the National Conventions and their candidate for the Presidency of the United States.  *Cf. Graves*, 2011 WL 3503133, at *14 (noting deprivation of voters' right to replace public officials whose terms are soon to expire).[8]

No party or intervenor in this action, or party in a Related Action, denies that voters are entitled to a periodic reapportionment process.  We understand Plaintiffs' concerns about the use of the 2001 Plan for the 2012 election.  However, when the Pennsylvania Supreme Court

---

[8] Defendant's counsel notes that, regardless of the Court's decision, "[t]here will be an election" although it may not occur until July or August.  (Feb. 6 Hr'g Tr. 37.)  He observes that "[t]here are states in this country that don't vote until September in their primary."  (*Id.*)  However, because this is a Presidential year, voters are entitled to vote in spring of this year.

determined that the LRC's final 2011 Plan was unconstitutional and remanded the matter so that the LRC could prepare a revised constitutional 2011 Plan, a situation that was fraught with uncertainty and was potentially disastrous was created. The Supreme Court attempted to stabilize the situation when it directed that the 2001 Plan be used. Under these unique circumstances, we are compelled to conclude that the election should proceed under the only-existing plan, the 2001 Plan. The granting of a temporary restraining order at this juncture would make no sense. Clearly, it would not be in the public interest. Accordingly, we will deny Plaintiffs' Motion.

### B.      Plaintiffs' Request for Three-Judge Panel Will Be Denied

Pursuant to 28 U.S.C. § 2284(b)(3), a single judge "shall not appoint a master, or order a reference, or hear and determine any application for a preliminary or permanent injunction or motion to vacate such an injunction, or enter judgment on the merits." This limitation on a single district judge's authority to hear and determine a preliminary or permanent injunction application is triggered only in proceedings in which the convening of a three-judge district court is required. *Page v. Bartels*, 248 F.3d 175, 186 (3d Cir. 2001). Pursuant to 28 U.S.C. § 2284(a), "[a] district court of three judges shall be convened . . . when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body."

In view of the imminent primary election and the fact that the election process has already begun, use of the 2001 Plan is permissible under *Reynolds* and its progeny. The injunctive relief that Plaintiffs request—intervention by this Court to stop Defendant from moving forward with the April 24, 2012 primary election process—is not a reasonable option. Plaintiffs, therefore, are

not entitled to a three-judge panel.  *See California Water Serv. Co. v.  City of Redding*, 304 U.S. 252, 255 (1938) (noting that a federal question "may be plainly unsubstantial" "because its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject and leave no room for the inference that the questions sought to be raised can be the subject of controversy" and that "when it becomes apparent that the plaintiff has no case for three judges, though they may have been properly convened, their action is no longer prescribed") (citing *Oklahoma Gas & Elec. Co. v. Oklahoma Packing Co.*, 292 U.S. 386, 391 (1934)); *Maryland Citizens*, 429 F.2d at 611 ("If it appears to the single district judge, therefore, that the complaint does not state a substantial claim for injunctive relief, he need not request the convening of a three-judge court.").

## IV.    CONCLUSION

For all of these reasons, Plaintiffs' Motions are denied.

An appropriate Order follows.

BY THE COURT:

_____
**R. BARCLAY SURRICK, J.**